The first case on our call is Agenda No. 7, Case No. 123046, 1550 MP Road LLC v. Teamsters Local Union No. 700. Mr. Pendergast, are you ready to proceed? All right, you may proceed. Justice Thomas, may it please the Court, Richard Pendergast on behalf of Defendant Teamsters Local 700. Like most cases that come before this Court, the importance and the precedential impact of the issues of appeal extend well beyond this case. If allowed to stand, the appellate court's decision would permit the enforcement of contracts, even where explicit statutory requirements necessary for the validity of those contracts are not satisfied. It would also create a new, less stringent exception to the general rule in Illinois on successor non-liability. There are two liability issues before the Court this morning, and I want to speak to those. I'd rather use the time on these two, but I'm happy to answer any questions on the third issue if the Court is inclined. The first of the two liability issues is whether the lease purchase agreement, referred to as the LPA, is void ab initio because the requirements of the Property of Unincorporated Associations Act, which I'll refer to as PUA, were not satisfied. A related issue concerns the fact that the LPA is ab initio because, void ab initio because it does not comply with the requirements of Local 726 bylaws, as discussed in the Alliance case. But I'll primarily focus on the, for the argument this morning, on non-compliance with PUA, because absent that statute, an unincorporated association was without legal authority to enter into a real estate contract of any kind. The second liability issue is whether there is a basis for imposing successor liability against Local 700, even though none of the recognized exceptions under Illinois law are present here. The plaintiff has to prevail on both of these issues. If it does not, there is no basis for imposing liability on Local 700. The appellate court erred in holding that the LPA is a valid and enforceable contract. It is undisputed that under common law, prior to the enactment of PUA, an unincorporated association could not lease or purchase real estate. As such, any contract purporting to transfer the interest in real estate to an unincorporated association was void ab initio under common law. An unincorporated association simply did not have the legal capacity to enter into such a contract. PUA was enacted in derogation of the common law rule to allow unincorporated associations to buy or lease real estate. But in doing so, the General Assembly set forth express requirements that must be satisfied for an unincorporated association to lease or own property. Specifically, PUA expressly provides that the membership of an unincorporated association must be given advanced written notice of the contemplated transaction and a majority of the membership of the unincorporated association must vote to approve the real estate transaction. Neither one of those things happened here. The membership of Local 726 was not given any advance notice of the contemplated contract. Local 726 never voted to approve the lease agreement. These facts are conceded by the plaintiff and the courts below have likewise recognized that these requirements were not met. Mr. Pendergast, do you contend that it was plaintiff's responsibility to ensure that the union had complied with the statute before the plaintiff entered into a contract with the union? I'm not placing fault on one side or the other. It just didn't happen. And if it doesn't happen, you don't have an entity that can enter into, with the authority to enter into a contract. The authority of the local to enter into that contract is conditioned as it was, is conditioned, contrary to common law, is conditioned on meeting certain requirements. So it makes no difference, and I don't fault the buyer or the seller for not complying with PUA. It just didn't happen, and if it doesn't happen, then you do not, the exception to common law doesn't come into play. Just in the interest of fairness here, a couple follow-ups. The members of the union may have a grievance with the union, but why should the plaintiff be punished for the union's failure to fulfill its statutory obligation to its members? And as a tangent to that, do you see a problem with the union using its own misconduct as a justification for its failure? As a justification for avoiding its obligations under a contract? Well, let me take the first question. Could you rephrase it or restate it? It may be obvious that the members of the union may have a grievance with the union, but it seems that the plaintiff here is being punished by the union's failure to fulfill its statutory obligations. Let me speak to punishment. If the statute requires compliance with certain requirements, that law cannot be ignored just because it wasn't followed. But in this case in particular, you have a very sophisticated plaintiff here. I mean, he's a Purdue graduate. He graduated, he majored in contract construction, construction contract work. He's been in the business for a couple of decades. We're all supposed to know the law. Ignorance of the law is no excuse. But in particular, with a sophisticated party like this, represented by counsel, etc., he's got to know that the statute for unincorporated associations exists. Matter of fact, if you take a look at the bylaws, which I'm not going to argue about today because the time is limited, but the bylaws absolutely track PUA. They require exactly the same thing. He didn't get the bylaws, he didn't say, I want the operating documents, make sure this guy I'm dealing with has authority, make sure he's done everything that he has to do. This is a sophisticated builder in a sophisticated contract. And under those circumstances... In this case, perhaps, but what's bothering me is it would seem that under your analysis, the union could consistently fail to follow the statute, and then when it wants to get out of a contract it entered into, regardless, sophisticated person or not, say that the contract is void because the union didn't follow the statute. I mean, that's problematic to me. In addition, I don't see anything in the statute that says any contracts entered into are void ab initio if the statute is not followed. Well, Your Honor, on the second point, if the statute is not followed, we're back to common law. That statute's in derogation of common law. If you don't follow the statute, you're back to common law. If you're back to common law, they can't enter into a contract to own or purchase real estate. They don't have the authority to do that. They don't have the capacity to do that. So on that point, once you disregard the statute, you're back to a situation where you're dealing with an entity that doesn't have the legal authority to enter into a contract at all. And again, we're not dealing with an unsophisticated plaintiff here. We have a plaintiff here who's charged with knowing the law, he's got counsel, they can look at the law, they can see what it is, they can challenge it. And by the way, there is no evidence in this case that the union got together and decided, let's just do this contract, but let's do it wrong so we can get out of it. There's no evidence of that. In fact, with respect to the international's vote, which relates to the next issue, most of the members of the international didn't even know about this contract. So I understand your concern. I think an opinion could be written around that concern, but not an opinion that affirms this judgment. Because this is just clearly outside the scope of the capacity and the authority of the local 726 to enter into this contract to begin with. And if you disregard the statute, then you're right back to common law. I'm just wondering, if the lease agreement was never transferred to local 700, how did local 700 have the authority to modify the agreement? I'm not following. Local 700 did not modify the agreement, to my knowledge. That's what I'm saying, is that the lease agreement was never transferred, right, to 700? That's right. And did they subsequently modify, try to modify? Well, there was some negotiations at the time that it was going on to try to get to a contract that everybody could live with. And I think it's very important that we remain conscious of the fact that when you're entering into negotiations to try to resolve something, that should never be used against you. You're trying to reach some kind of a settlement, some kind of a middle ground, maybe you can make it work. It didn't work. That the negotiations, just like any settlement negotiations, are privileged in the sense that they can't be used substantively against a party. And in this case, did the Board of Trustees of the union ratify what this man had done, Mr. Clare had done, or am I incorrect on that? No, you're correct, the board tried to ratify. The problem is the board can't ratify. I'm not even sure the membership could have ratified a contract that doesn't exist, because it doesn't exist because of the noncompliance or back of the common law rule that they can't enter into the contract. But even if it could be ratified, it could only be ratified by the membership, because it could only have been passed in the first place by the membership. So no notice to the membership, no vote by the membership, no ratification by the membership. We can forget about ratification, it doesn't make any difference what the board did. So what you're saying is that anyone in dealing with the union is or should be on notice that they need to get all of these documents that would prove that the statute had been followed, is that what you're telling us? Yes, Your Honor, but all of those documents consist of, once you read the statute, which is one paragraph long, is can I see a copy of the written notice you sent to the members, and can you confirm that the vote was taken, and then a majority passed. That's all it takes. It's not complicated, but it has to be done, because if you don't do it, then you didn't follow the statute. There was no capacity to enter into this contract in the first place. The plaintiff wasn't the one that didn't follow the statute, it was the union that didn't follow the statute, isn't that correct? The union did not obtain the membership's, give notice to the membership, and did not get an affirmative vote from the membership. That's correct. But unless that's done, no matter whose fault it is, there's no contract. It's void ab initio, just as it would be a common law. And that's just the outcome that we have to live with, otherwise there's no reason for the statute, we can just tear it out of the books, because it prescribes the only circumstances under which an unincorporated association can enter into a contract for the lease or sale of real estate. Despite the fact that the expressed requirements of PUA were not satisfied, the appellate court refused to void the contract. That decision was an error for several reasons. First, it renders the text of PUA meaningless, and I think we've just discussed that. Second, it ignores the rule of statutory construction that requires courts to construe statutes in a way that gives effect to the intent of the legislature, as reflected in the plain language of the statute. The appellate court's nullification of these expressed requirements thwarts the legislative mandate. Third, the appellate court's interpretation of PUA is contrary to this court's rule that statutes and derogation of the common law should not be construed as changing the common law beyond what is expressed in the statute. So we've got three or four major rules of statutory construction that we can just forget about, if this judgment is affirmed. And when I said in the beginning that this case has ramifications beyond this case, just like most cases do that are before this court, that's exactly what I'm talking about. There are a number of well-stated rules that this court has laid out in prior decisions that will just have to be disregarded. And those rules of construction are important in all kinds of cases. I can see the next brief and somebody saying, back in that Teamster's case, you didn't worry about all these rules of construction, so why are we worrying about them here? Essentially, the appellate court's decision is a misplaced reliance on this court's decision in the Jay Miller case, or Kay Miller case. Kay Miller addressed a different question, whether a contract can be enforced when one of its terms violates the statute. The question here is not whether a term of the LPA violates an Illinois statute, but rather it's that the LPA was extended by, was executed by a party that lacked the legal capacity to enter into the contract in the first place. In other words, the contract never came into existence because Local 726 was legally incapable of entering into the LPA without complying with PUA. Under these circumstances, the contract is void ab initio, just as it would be at common law. The appellate court also incorrectly concluded that PUA is silent as to the consequences of noncompliance. And I think that, Justice Thomas, relates indirectly to one of your questions. In Kay Miller, the statute required contractors to give customers written contracts for remodeling their work over $1,000. But unlike the situation here, there was no, there was nothing at common law that prevented contracts from entering into such contracts. By contrast, at common law, unincorporated associations are not permitted. That is, they lack capacity to enter into the contract. Thus, by setting forth the express conditions for an unincorporated association to own or lease real estate, the legislature defined the only circumstances where an unincorporated association may own or lease real estate. And the consequences for noncompliance with PUA requirements is that the common law rule controls, and we revert back to it. I think I've already addressed that. The appellate court was also wrong, we believe, in holding that public policy concerns favor finding the LPA enforceable. The failure to comply with PUA's requirements deprived individual members of Local 2726 of the very safeguards that PUA is designed to provide to members of unincorporated associations. At common law, you couldn't even enter into this contract. PUA is passed, says, yes, you can, but the members can be individually liable if that happens. And so there has to be protection, and the protection has to be that those members have to have a say. And how do you give them that? You give them notice in writing, and you make them take an affirmative vote, and unless and until that happens, the members would be exposed to liability unless they've had their say. That was the compromise that was reached when PUA was written. That was the compromise with the common law rule. They could have just abolished the common law rule, but they didn't. The legislature didn't do that for a reason, and the reason was to protect the members from personal liability unless they had something to say about it. Plaintiff also argues that Local 726 has judicially admitted the validity of the LPA. That never happened, and I'm not going to go into it. We've covered it in our briefs, and I know my time is starting to run. Plaintiff also claims that arguments regarding the enforceability of LPA have been waived. That never happened for the reasons we set forth in our brief. Plaintiff's reliance on the Shackenberg rule also fails. The case applies to cases involving the enforcement of illegal or immoral contracts. That's not what we're talking about here. It does not address the question here, nor is there any evidence that the members of 726 condoned or even were aware of the failure to satisfy PUA. To your question of, you know, isn't the union being rewarded here, if the members had all known that there was supposed to be notice and there was supposed to be a vote, and they didn't care, and they didn't care, you know, you might have some argument along those lines, some set of facts would prove that, but that's not the situation here. There's no evidence that they were even aware of the existence of this before it was signed. Now, the second liability issue is the successor liability issue. The appellate court erred in imposing the successor liability on Local 700. Local 700 is not liable under the LPA for separate and independent reason that it is not a successor in interest to 726. Illinois recognizes four exceptions to the general rule of successor. Your time has expired. If you could just finish your thought, maybe pick that up and revote it. I'll do that, Your Honor. My thought was that the four exceptions are clearly inapplicable here under Illinois law. That is precisely why the appellate court resorted to the substantial continuity test. The continuity test is specific to labor cases. I'll be glad to address that in rebuttal as to why that's the case. If there are exceptions for successor liability, then the liability cannot go to 700, and the absence of identity of ownership here is probably the most paramount reason why those exceptions don't apply, at least as to the first two of them. Thank you very much for your time and for the opportunity to address your report. Thank you. Please, the court. Excuse me, Justice Thomas, members of the court. I'm sure as the highest court... Richard Hellerman on behalf of the plaintiff in Appalachia, 1550 M.P. Road, LLC. As I'm sure many cases before this court have noted, there's this inherent question, is a case right because it's final, or is it final because it's right? I submit that in this case, it is demonstrably the latter. And on the subject of what is right, this court has the benefit, as do all courts of review, of affirming a decision based on anything that's in the record that supports affirmance. In this case, while both the trial court and then the appellate court pointed to myriad reasons why this judgment was right and appropriate, there are, as we mentioned in our brief, probably 10 other reasons as to why this opinion, this judgment, were right. This court can and should and must affirm if there's any basis in the record for affirmance. What I find striking, and what I have always found striking about the position that the Teamsters have taken in this case, is that it appears that unless it benefits the Teamsters, no other rule that in any way takes something away from the Teamsters in any way applies to them. And I can point to about nine things in the record, nine things in the history of this lawsuit, and frankly, that precede and predate the history of this dispute and this lawsuit, where the Teamsters just say, doesn't apply to us because it's going to hurt us. First of all, Mr. Prendergast mentions how Mr. Friedman, who is this sophisticated developer, he has to know the law. He has to know that the PUAA exists. Well, what about the Teamsters? It's a statute that is directed to the very nature of the very entity that the Teamsters are, an unincorporated association. So the argument is, it's up to Mr. Friedman, doing business with the Teamsters, to know the law that relates to the Teamsters, but apparently it's not on them. And all Mr. Prendergast can say is, well, I'm not blaming anybody. I'm not blaming him, and I'm not blaming us. It's their statute. You do blame them. And it's not just in this case, because here's where we get into this beginning of the situation where nothing that doesn't work to their benefit applies to the Teamsters. It is not just this lease where they violated the PUAA and had one signature and no vote. It is the lease immediately preceding this lease, which was evidence in the record at this trial. They fully performed that lease. That was down in Teamsters City. The undisputed evidence in the case, as you all know, is that every lease, every lease, that this local, 726, entered into, for as far back as the 30-year members of the Executive Committee could recall, violated the PUAA. They never complied with the PUAA. There is no evidence in this record before this Court that this unincorporated association ever gave heed to, knew about, or complied with the very statute that did not apply to Teamsters. It governs how they, as an unincorporated association, were bound to act. And yet they come before this Court and they say, that gets us out of the agreement. It doesn't apply to them. The waiver, and we're not talking about litigation waiver by failing to mention it in the litigation. I appreciate that the law is that you can kind of never waive a statutory violation. You can raise it at any time. I get that. I'm not talking about not raising it from 2010 to 2014. I'm talking about never heeding this statute in the history of the organization. That's waiving a statute, period. It's waiving a statute. Interestingly, neither the trial court nor the appellate court ruled on that basis. But they could have, and so can you. That's a pure waiver of a statute. If you never treat the statute as having existed, and we can argue, and I certainly, if I have enough time, I doubt I will, can argue that this statute isn't for the benefit of the members that Mr. Prendergast has just argued. The fact is, there's nothing in this statute, or in the history of the statute, that talks about it being for the benefit of the members, for the protection of the members. That's not in the legislative history. It's not in the text of the statute. But back to my point. That's the first thing that the Teamsters say doesn't apply to them. They're a complete waiver of this statute. The affirmative defense issue, the judicial admission issue, I think they're wrong. I think Justice Burke aptly pointed it out. They admitted, they judicially admitted, in a verified pleading, that prior to the switchover from 726 to 700, 726 reached a modification of the agreement with 1550. They admitted it in an affirmative defense. It was in a verified pleading. It's a judicial admission. So having admitted that the lease was modified, the necessary corollary of that is that there was a valid lease to modify. Because if it wasn't a valid lease, it can't be modified as a matter of law. Only an existing contract, a valid contract, is capable of being modified. Otherwise, you're just creating a contract anew. They admitted judicially in their verified affirmative defense. And they later tried to, they did withdraw the defense, but in a verified pleading, it doesn't matter. They admitted that the contract, the lease, had been modified. In so doing, they admitted that the lease was valid in the first place. Another basis that the trial court and the appellate court didn't look at, but they could have. And so could you. The third thing where the Teamsters say it doesn't apply to us has to do with the other section of the PUAA. They don't talk about it. Section 3. Section 3, after giving the power, if you will, of unincorporated associations to contract for leases and for real estate. Section 3 says that now that they can enter into leases, they can also sue and be sued on its real estate. I think the phrase is an action concerning its real estate. So they come before you saying they can't be sued because of their own violation of this statute that they've ignored for their entire history. But what they haven't mentioned is in this lawsuit, they filed third-party actions against Mr. Clare and all the other executive board members. So they sued their executive board concerning its real estate in the third-party action. So they seemingly under Section 3 felt that they could sue, but they just can't be sued. How convenient. Nothing sticks to the Teamsters. They can do what they want, but they don't suffer consequences by not following the law. That's the theme of this lawsuit. The equities of this case, which I believe, Justice Thomas, you pointed out with your first question, are so strong here. We have an innocent third party who entered into an arm's-length commercial transaction. And it's interesting how they're pointing to how qualified and skilled and educated Mr. Friedman is. All true statements. He's quite skilled and quite qualified and quite educated. The Teamsters' job is to negotiate contracts. So I don't think there was some disparity here. The entire, the raison d'etre of the Teamsters is to negotiate contracts. So I don't think this is something that just happens to be a side job for this organization. This is their existence. So they should be held as strictly as anybody else to the standards of how you properly execute contracts and what your consequences are if you don't. They seem to say that because there's this new entity, this new sheriff in town, Local 700, and that wasn't formally transferred, this lease, Local 700 can't substitute for Local 726. The law doesn't allow it. Well, that's exactly what Local 700 did in the collective bargaining agreements that Local 726 had. They never even changed the contracts. On day one, 700 stepped into the shoes of 726 for every CBA. Can I ask you a question about structure? In this issue of successor liability, obviously we have some misfit here because we're talking about corporate successor liability, and we understand this is unincorporated. That's sort of the problem. Could you explain to us the structure, just a little bit of the structure here? Rather than having, let's say, two different corporations negotiating in terms of how one will merge or buy out or whatever the term is going to be, here you've got the International Brotherhood of Teamsters, and apparently it was through their action that something, some verb occurred. It dissolved one, and my first question is, in the record, does it explain exactly what the order of the IVT was, in terms of was it to consolidate, to merge, what was the verb they used, number one? And two, how do the relationships between all of these parties fit together when we're talking about these ideas of continuation and those kind of words? Certainly. I think the verb you're looking for is the action of the IVT dissolved Local 726 and chartered Local 700. That's the term of art within the Teamsters for creating a new union. They receive or obtain a charter from or through the international. There's some language in the briefs about consolidation. Yeah, there certainly is. Is that word there, too? Well, that's the next point I was going to get to. So that's at the executive, general executive board level at the top in Washington, Hoffa and his pals, they create a new local by charter, by a consent or an order, which they made, that a new union is going to be chartered. Okay, that's that. Then we have the general secretary treasurer of the entire international who writes a letter to John Coley, who was the main guy here in Chicago area. And he wrote, unsolicited, that the new union is going to be structured as a consolidation of the two unions that were, whose members were being moved in to create this new union. And that's the other, you know, funny thing, where the Teamsters here, in this case, talks about how these, you know, these new unions are going to be subject to this potential liability, and particularly these other local 714 people who had nothing to do with this. That, again, is not Mr. Friedman's doing. The international created this, and the locals lived by it. So they're using this argument that, well, we're the real victims here because the individual members could be liable. First of all, we didn't sue the individual members, so no, they aren't liable. We could have, but we didn't want to sue 5,000 people. We could have, but we didn't. So they're not subject to liability at all. But to suggest that it's unfair to them, they created the situation. The international did this. So to suggest that, well, because we structured it in this way, that makes it unfair and inequitable to subject us to judgment. No, this was your doing, just as it was their doing to not follow the PUAA for 35 years. So what is this? How does it work? Well, one of the traditional exceptions to successor non-liability is when there is a merger or consolidation. Well, the Teamsters' third highest guy, right after this happened, said, this will be structured as a consolidation. What else did they say? Well, they had tax returns that they filed, and they're non-profits, so they're Form 990s. They're not the usual 1040s. But in the 990, signed by the assistant trustee under oath, under penalty of perjury, they said the assets were transferred in the merger to the successor, Local 700. So if you didn't feel comfortable with the substantial continuity extension of the law, that both the trial court and the appellate court ruled should happen here, and I submit that you should feel comfortable with it, because if you find that the traditional exceptions don't fit this unorthodox organization structurally, then you still have to get back to, what is the point of the concept of successor liability? And the point of the concept of successor liability is that you want to protect, third parties who do business with entities, you want to protect them from changes in form that are not really changes in substance. I can't think of a more on-the-nose scenario than the 726 to 700 shift. It's a change in form, they wear a new hat on January 1, but they are exactly the same entity. Yes, there's other members from another local, all other government employees, they pop in there, but they're doing exactly the same thing. All the other assets are transferred, they are in our space, the leased space, and the only thing that happens in their world that's different is that they're no longer subject to the terms of the lease. But everything else is entirely continuous. The continuum just goes straight through. Yes. Yes. Which I know is a different but related concept to actual authority. And I'm glad that you raised that question, because apparent authority works in, the effect of apparent authority works in precisely the same way as actual authority. In fact, the question of actual authority is irrelevant to the question of apparent authority. The trial court and the appellate court found that Mr. Clair had apparent authority to enter into this lease, and apparent authority is certainly legal authority. So how is it that he has apparent authority? Well, he was held out by both the gentleman associated with 726, Mr. Diaz, that introduced him to Mr. Friedman, Mr. Clair himself held himself out repeatedly as the guy who does these leases. There was the immediately prior lease that Mr. Clair signed solo. There was every member of the executive board who visited this property multiple times, 15 to 20 times was the evidence at trial. All the negotiations were going on while Mr. Friedman was spending money developing this property to suit this union. We're going to put the conference room here, we're going to put the offices there. These executive board members consistently visited. They consistently approved what was going on. They knew everything. If at any point in time one of them had said, wait, why is Tom Clair here? What is he doing? That would be a different case, wouldn't it? He had apparent authority. He was held out by Local 726 as having the authority to execute this lease. It was reasonable for Mr. Friedman to rely on that because every indication was that that's exactly what Clair did. He was the principal officer of the union. He signed the prior lease. Everybody else that ran the union saw him, visited with him, worked with Mr. Friedman. No, and I've seen none in this record. The Teamsters would like to say, yeah, it's on the plaintiff to determine this. Neither the PUAA says that, nor any other statute or rule or case. The only thing that the apparent authority concept brings in is that the reliance on the holdout being held out, as Mr. Clair was, by Mr. Friedman, be reasonable. When every executive committee member visited 15 to 20 times, when Mr. Clair signed the last lease, when Mr. Clair said, I'm the guy, when Mr. Diaz says, yeah, he's the guy. When everybody, God bless you, when everybody says he's the guy, and he says he's the guy, and the last lease was signed by him as the guy, I submit that satisfies reasonable reliance by Mr. Friedman. So, no, I don't believe they have to go beneath and go under and go past what seems clearly on its face to be reasonable. So he does have authority, he did have authority, and on the subject of apparent authority, I will say, while the Teamsters argued this at trial, and while they argued it to the appellate court, nowhere in the brief to this court have the Teamsters questioned the ruling on apparent authority. They have put all of their eggs in the PUAA basket. And one more word on the PUAA. Mr. Prendergast consistently talks about how the... One more word? One more sentence? Yeah, go ahead. I'll make it a run on things. While Mr. Prendergast talks about how it's your duty to construe the statute to give meaning to its terms, the term only, in the context of may only sign a lease, the term only is not there. The term enforceable is not there. The term void ab initio is not there. The term authority is not there. By the way, those were separated by commas in my sentence. So my point is, when you are asked to construe the statute and the words in the statute, that's how you determine the intent of the legislature, is to look at the words. The words that the Teamsters are advancing for your construction of this statute don't appear in the statute. Thank you. Thank you for your time. To your question, Justice Burke, Claire did not have authority. She didn't have authority under PUAA, which requires two signatures of officers, including the President. She didn't have authority under the bylaws, which requires signatures. She didn't have authority under any document or any – he didn't have authority. The argument that he had apparent authority – I want to point out this business about prior leases. Mr. Friedman was not a – or his company were not signatories to those prior leases. So apparent authority is what he perceived. He didn't have any knowledge of those prior leases, so they're irrelevant. They bring them out because Claire signed prior leases and nobody complained about it, and so they went on, life went on. That doesn't mean that the PUAA statute doesn't apply. It doesn't mean that the bylaws don't apply. It just means that there was never an occasion to challenge the lease on those prior leases. But it certainly doesn't establish apparent authority. But the argument for apparent authority, in my judgment, is a rather desperate one, because there is no authority in Claire to do this. Totally apart from that, though, there are a number of other issues. Counsel said it's the union's statute. It's not the union's statute. It's not the member's statute. It's a statute of the State of Illinois that applies to all unincorporated associations. It doesn't just apply to unions. It doesn't just apply to the Teamsters. And this business about the Teamsters always wanted their way, that's editorial. I mean, that's not part of this record. That's not part of any evidence. It's an argument that counsel is perfectly willing to make, and I'm not going to fault him for it. It has nothing to do with this appeal. Some of the other points counsel made, the business about the fact that they negotiate labor contracts, that's fine. I mean, that's what they do, and they're good at it, I imagine. They're well versed in it, but that's not the kind of contract we have here. Here you have a very sophisticated contract that had three different ways that the plaintiff could recover. The five-year option to buy, and if they didn't exercise the option to buy, you could continue to pay the rent. But if you were going to pay the rent, you had to pay double rent after the option to buy. It was a very complicated contract, one that Mr. Friedman might have been very well aware of, but certainly Mr. Clair, out of his league, Mr. Clair was a truck driver for a municipality, and prior to that he was a bargaining agent. The level of sophistication between the parties is dramatic. I'm not saying that that knocks the contract out. I'm just putting it in the context of this business about the Teamsters want this and Teamsters want that. The fact is that the board, the international, recognized that 726 and 714 were both in trouble. They were mismanaged, they were poorly run locals, so they decertified them, they took away their charter, and they created another local, 700, that their members could join if they chose to join. But if they joined that, then they would be under 700. What we haven't talked about here is successor liability, because the party that's being sued here is 700, not 726. So how does 700 become 726? It doesn't become 726 under the four exceptions to non-successor liability, or successor non-liability. It is the rule in Illinois. We've outlined the four requirements for, or the four exceptions for successor liability. None of them apply here, which is precisely why the appellate court chose not to follow the Illinois law on this, and they adopted the substantial test, the substantial continuity test for successor liability in order to get local 700 liable here. Local 700 didn't negotiate this contract. Local 700 was created for, and by the way, most of the members of the international board, as I said earlier, didn't even know about this contract. It had nothing to do with the reason why 700 was set up. If that had been the case, they might have been able to get the fraud exception, or one of the other three exceptions in under the standard continuity requirements for Illinois. That wasn't the case. They had perfectly good, solid reasons, which is precisely why, for example, none of the board members, the international members, or the international, were ever found liable in this case. They didn't do anything wrong. They did not move into the new quarters. They did not set up business there. What happened was there was a trustee established by the international, because these local unions weren't being well run, and immediately took a look at this contract and realized it was so one-sided that it was not something that they wanted to live with, and then they recognized that it wasn't even a legal contract to begin with, and so they associated it. What about the consolidation concept that counsel brought up? You're saying that the two unions were fully run, and they really weren't consolidated? No. What happened was they decertified two unions. They took their charters away. Then they created, at the same time they created the union, and allowed the members to join that local. They didn't have to join that local, by the way. No one's impressed into service here and required to join Local 700. Local 700 was available to the members if they wanted to belong to Local 700. They joined Local 700. That's not a merger. It's not a consolidation. If they wanted to do a consolidation, they would have done it differently. There would have been articles of merger. There would have been a lot of other paperwork that would have been used. And even if it were the case, the fact is that in this case, New Local 700 did not accept the lease as one of the liabilities that Local 700 was set up with. They took other liabilities of 726. They took assets of 726. In fact, it netted out to be a loss. There was $46 million in assets that was transferred to 700. There was $75 million in liabilities that were transferred. But the one potential liability that was not transferred or was not accepted was this lease because this lease didn't have legal authority to begin with. So 700 was created by the international. It's perfectly legitimate. And members were permitted to join it. And the other two locals were decertified. The members of 714, 60% of the membership of 700 came from 714. That means that because it's an unincorporated association, they all have individual liability. So 60% of the members of the New Local are made up of people from 726 or 714 who never had anything to do with this contract. I mean, neither did the members from 726 because they were never given notice of it and they never voted on it. But put that aside, 60% of 700 is 714. They have nothing to do with this. And so when they talk about consolidating, all of those people, by virtue of succession, if there were succession, which there is not because there's a rule against succession and the four exceptions don't apply, if that were the case, all of those individuals who joined 700 would be saddled with the liabilities of this lease. Now, when you talk about equities, that one should be weighed in there as well. So it's a long answer to your question, Your Honor, but I think it's an important question. The four traditional exceptions, the de facto merger, the mere continuation, the exception of liability and fraud, none of them apply. The appellate court recognized that none of them apply. That's why they went to the continuity, substantial continuity means of succession. The problem with that is that's unique to federal labor cases and it's unique to federal labor cases because when you have a – you don't want a new company to just take over the assets of an old company and then be able to walk away from the collective bargaining agreement. And you don't want a union that is under a consent decree, not to discriminate, for example, to just recreate another local and avoid their consent decree. So they have that unique succession provision in the continuity rule, but in federal cases have said it's unique to labor cases. Well, that's what the appellate court applied. And so let's forget for a second PUA, although I hope it's only a second. When you leave PUA and you go on to successorship, they have to win on both of those issues on liability. If they do not, there is no liability here. And there's clearly no successorship from 700 to 726. If you could finish up, Mr. Brenner, yes. Your Honor, I've got all this work in front of me that I was going to tell you about, but I know there is a time limit, and I appreciate the court's patience. So I will close with that. I don't have a pithy phrase or something to close this out with. I just appreciate the court's time and the courtesy of being here. Thank you so much. Thank you, Mr. Pendergast. Case number 123046, 1550 MP Road, LLC, versus Teamsters Local Union, number 700, is taken under advisement as agenda number 7. Mr. Pendergast, Mr. Hellerman, thank you very much for your arguments this morning. You are excused.